HON CARL E. MOORADIAN Corporation Counsel, Niagara Falls
This is in response to your two letters, each dated October 12, 1976, wherein you ask for an opinion of the Attorney General as to whom should exercise the powers of appointment to the Niagara Falls Urban Renewal Agency. You also ask if it is necessary to follow the provisions of Municipal Home Rule Law, § 40, in order to have the State Legislature change the composition of the Agency by a special act.
New York State Constitution, Article XVIII, § 1, authorizes the State Legislature to provide for urban renewal programs and section 2 provides for the State Legislature to augment such programs through "public corporations" as well as certain municipalities and certain corporations regulated by law.
Pursuant to such constitutional authority implemented by General Municipal Law, Article XV-A, known as the "Urban Renewal Agency Act", the Niagara Falls Urban Renewal Agency was established by a special act of the State Legislature pursuant to provisions of Laws of 1964, chapter 545, as amended by Laws of 1965, chapter 351 and appears in General Municipal Law as Title 24, section 593 in Article XV-B thereof. It is a public benefit corporation under provisions of General Municipal Law, § 553 (2).
General Municipal Law, § 593, provides:
 "A municipal urban renewal agency, to be known as the Niagara Falls urban renewal agency, is hereby established for the accomplishment of any or all of the purposes specified in articles fifteen and fifteen-A of this chapter and in accordance with article eighteen of the constitution of the state of New York. It shall constitute a body corporate and politic, shall be perpetual in duration, and shall consist of the mayor and all of the councilmen of the city of Niagara Falls, together with four members to be appointed by the mayor with the concurring approval of the city council. It shall have the powers and duties now or hereafter conferred by article fifteen-A of this chapter upon municipal renewal agencies. It shall be organized in the manner prescribed by and be subject to the provisions of article fifteen-A of this chapter and the agency, its members, officers and employees and its operation and activities shall in all respects be governed by the provisions of such article." (Emphasis supplied.)
General Municipal Law, § 552(4), defines the term "Mayor" as follows:
 "4. The term `mayor' shall mean the chief executive officer of a municipality."
Niagara Falls City Charter, § 44, provides that the administrative and executive powers, including powers of appointment of officers and employees of the City of Niagara Falls, are vested in the City Manager. Section 44 enumerates in great detail the administrative and executive powers of the City Manager. The Charter, in section 42, provides, in part:
 "The mayor shall preside at all meetings of the council. He shall be the official head of the city for the service of civil process, and under the military law, and for all ceremonial purposes. He shall have no power to veto, but shall have the same power as a councilman to introduce and vote upon all matters coming before the council. * * *" (Emphasis supplied.)
It is apparent that the appointed City Manager, and not the Mayor, is the Chief Executive Officer of the City of Niagara Falls.
The Niagara Falls Urban Renewal Agency was established under provisions of General Municipal Law, Article XV-B, Title 24, section 593. Said section contains a specific provision that it shall be organized in the manner prescribed and subject to provisions of General Municipal Law, Article XV-A. The definition of the term "Mayor" contained in section 552(4) of said Article XV-A, when read in conjunction with the provisions of Niagara Falls City Charter, § 44, clearly demonstrates that the City Manager of the City of Niagara Falls, as the City's Chief Executive Officer, is authorized to make appointments to membership on the Niagara Falls Urban Renewal Agency, rather than the Mayor.
New York State Constitution, Article IX, § 2(b) (2) (a), provides, in part:
 "(b) Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature:
* * *
 "(2) Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership * * *."
Municipal Home Rule Law, § 40, implements the constitutional provision by providing, in part:
"The elective or appointive chief executive officer, if there be one, or otherwise the chairman of the board of supervisors, in the case of a county, the mayor in the case of a city or village or the supervisor in the case of a town with the concurrence of the legislative body of such local government, or the legislative body by a vote of two-thirds of its total voting power without the approval of such officer, may request the legislature topass a specific bill relating to the property, affairs orgovernment of such local government which does not in terms and in effect apply alike to all counties, all counties other than those wholly included within a city, all cities * * *." (Emphasis supplied.)
In enacting General Municipal Law, Article XV-A, known as the "Urban Renewal Agency Act", the State Legislature declared in section 551 that "It is hereby declared to be the policy of this state to promote the expeditious * * * completion of urban renewal programs * * *" and "the use of such rights and powers is a public purpose essential to the public interest, and for which public funds may be expended."
It is apparent from the wording contained in General Municipal Law, § 551 that matters relating to urban renewal are of State concern and do not relate to "property, affairs or government" of a municipality in which the urban renewal agency functions.
General Municipal Law, § 553(2), in referring to urban renewal agencies, provides, in part:
"2. An agency shall be a corporate governmental agency, constituting a public benefit corporation. * * *" (Emphasis supplied.)
In Matter of Courtney Bell v. Manhattan and Bronx SurfaceTransit Operating Authority, 81 Misc.2d 162 (Supreme Court, Bronx County, 1974), the Court in referring to the status of the Bronx Surface Transit Operating Authority, stated, in part:
 "* * * The respondent was created under subdivision 2 of section 1203-a of the Public Authorities Law as a public benefit corporation, and as such it is, as the name implies, a corporation (see General Construction Law, § 65). The very name, `public benefit corporation', imparts a distinct connotation of separateness and judicial distinction from the State, its political subdivisions and municipal corporations (cf. Matter of Dormitory Auth [Span Elec. Corp.], 18 N.Y.2d 114; Matter of New York Post Corp. v Moses, 10 N.Y.2d 199; Matter of Smith v Levitt, 37 A.D.2d 418; Goodman v City of New York, 46 Misc.2d 432; Ciulla v State of New York, 191 Misc 528)."
From all of the foregoing, we conclude that since matters relating to urban renewal agencies are of State concern and do not relate to property, affairs or government of the City of Niagara Falls, said City is not authorized under provisions of Municipal Home Rule Law, § 40, to request the State Legislature to enact a special law changing the composition of the Niagara Falls Urban Renewal Agency, nor is the Niagara Falls Urban Renewal Agency authorized to make such request under said section since it is a public benefit corporation distinct and apart from the municipality of the City of Niagara Falls and only counties, cities, villages and towns are authorized to request enactment of special laws under the aforementioned section 40. However, the City of Niagara Falls or the Niagara Falls Urban Renewal Agency would not be precluded from urging the Senator or Assemblyman representing the City of Niagara Falls to help effectuate the desired purpose.